GRIER, J.
I concur with this opinion of my brother Catron.
Note. — I here take occasion to say, that the State police power was more relied on and debated in the cause of Norris v. The City of Boston than in this cause. In that case I had prepared an opinion, and was ready to deliver it when I delivered this opinion in open court. But being dissatisfied with its composition, and agreeing entirely with my brother Grier on all the principles involved in both causes, and especially on the State power of exclusion in particular instances, I asked him to write out our joint views in the cause coming up from Massachusetts. This he has done to my entire satisfaction, and therefore I have said nothing here on the reserved powers of the States to protect themselves, but refer to that opinion as containing my views on the subject, and with which I fully concur throughout.
Mr. Justice McEINLEY.
Norris v. City of Boston and Smith v. Turner.
I have examined the opinions .of Mr. Justice McLean and Mr. Justice Catron, and concur, in the whole reasoning upon the main question, but wish to add, succinctly, my own views upon a single provision of the Constitution.
The first clause of the ninth, section and first article of the *453 Constitution provides, that “ the .migration or importation of such persons as any of the States now existing shall think proper to admit shall not be prohibited. by the Congréss prior to the year 1808; but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person.” '
On the last argument of this cause, no reference was made to this clause of the Constitution ; nor have I ever heard a full arid satisfactory argument on the subject. Yet on a frill ex-aminatiop of this clause, connected with other provisions of .the Constitution, it has had a controlling influence on my mind in the détermination of the case before us. Some of my brethren have insisted that the clause here. quoted applies exclusively to the importation of slaves. If the phrasp, i“ the migration or importation of such persons,” was intended by the Convention, to mean slaves only, why, in the assertion of the taxing power, did they, in the same clause, separate migration frorn importation, and use the following language: — “ But a tax or duty may be imposed on such importation, not exceeding ten dollars'for each person”? All will admit, that, if the word migration were excluded from the clause, .it would apply to slaves only. An unsuccessful attempt was made in the Convention to amend this clause by striking out the word migration, and thereby to make it apply to slaves exclusiyely. In the face of this fact, the debates in the Convention, certain numbers of the Federalist, together with Mr. Madison’s report to the legislature of Virginia in 1799,; — eleven years after the adoption of the Constitution, —' are relied on to prove that the words migration and importation are synonymes, within the true intent and meaning of this clause. * The acknowledged accuracy of language and clearness of diction in the Constitution would seem to forbid the imputation of so gross an error to the distinguished authors of that instrument.
I háve been unable to find any thing in the debates of the Convention, in the Federalist, or the report of Mr. Madison, inconsistent with the construction here given. Were they, however, directly opposed to it, they could not, by any known rule of construction, control Or modify the plain and unambiguous language -of the clause in question. The conclusion, to my mind, is therefore irresistible, that there are two separate and distinct classes of persons intended to be provided for by this clause.
Although they - are both subjects of commerce, the latter class only is the subject of trade and importation. The slaves are not immigrants, and had no exercise of volition in their transportation from Africa to the United States.
' The owner was bound to enter them at’the custom-house as *454 any other article of commerce or importation, and to pay the duty imposed by law, whilst the persons of the first class, although subjects of commerce, had the free exercise of volition, and could remove at pleasure from one place to another ; and when they determined to migrate or remove from any European government to the United States, they voluntarilyxdissolved the bond of allegiance to their sovereign, with the intention to contract a temporary or permanent allegiance to the government of the United States, and if transported in an American ship, that allegiance commenced the moment they got on board. They were subject to, and protected by, the laws of, the United States, to the end of their voyage.
Having thus shown that there are two separate and distinct classes included in, and provided for by, the clause of the Constitution referred to, the question arises, how .far the persons of the first class are protected, by the Constitution and laws of the United States, from the operation of the statute of New York now under consideration. The power was conferred on Congress to prohibit migration and importation of such persons into all the new States, from and after the time of their admission into the Union, because the exemption from the prohibition of Congress was confined exclusively to the States then existing, and left the power to operate upon all the new States admitted into the Union prior to 1808. Four new States having been thus admitted within that time, it follows, beyond controversy, that the power of Congress over the whole subject of hiigration and importation was complete throughout the United States after 1808.
The power to prohibit the admission of “all such persons” includes, necessarily, the power to admit them on such conditions as Congress may think proper to impose; and therefore, as a condition, Congress has the Unlimited power of taxing them. If this reasoning be correct, the whole power over the subject belongs exclusively to Congress, and connects itself indissolubly with the power to regulate commerce with foreign nations. How far, tíren, are these immigrants protected, upon their arrival in the United States, against the power of State statutes ? The ship, the cargo, the master, the crew, and the passengers are all under the protection of the laws of the United States, to the final termination of the voyage; and the passengers have a right to be landed and go on shore, under the protection and subject to these laws only, except so far as they may be subject to the quarantine laws of the place where they axe landed; which laws are not drawn in question in.this controversy. The great question here is,. Where does the power of the United States over this subject end, and where does the *455 State power begin ? This is, perhaps, one of the most perplexing questions ever submitted to the consideration of this court.
A similar question arose in the case of Brown v. The State of Maryland, 12 Wheat. 419, in which the court carried out the power of Congress to regulate commerce with foreign nations, upon the subject then under consideration, to the line which separates it from the reserved powers of the States, and plainly established the power of the States over the same subject-matter beyond that line.
The clause of the Constitution already referred to m this case, taken in connection with the provision which confers on Congress the power to pass all laws necessary and proper for carrying into effect the enumerated and all other powers granted by the Constitution, seems necessarily to include the whole power over this subject; and the Constitution and laws of the United States being the supreme law of the land, State power cannot be extended over the same subject. It therefore follows, that passengers can never bé subject to State laws until they become a portion of the population of the State, temporarily or permanently; and this view of the .subject seems to be fully sustained by the case above referred to. Were it even admitted that the State of New York had power to pass the statute. under consideration, in the absence of legislation by Congress on this subject, it would avail nothing in this case,. because the whole ground had been occupied"by Congress before that act was passed, as has been fully shown by the preceding Qpinion of my brother Catron. The laws referred to in that opinion show conclusively that the passengers, their moneys, their clothing, their baggage, their tools, their-implements, &c., are permitted to land in the United States without tax, duty, or impost.
I therefore concur in the opinion, that the judgment of the court below should be reversed.
Mr. Justice Catron concurs in the foregoing opinion, and adopts it as forming part of his own, so far as Mr. Justice McKinley’s individual' views are expressed, when taken in connection with Mr. Justice. Catron’s opinion.
Mr. Justice GRIER.
Norris v. City of Boston.
As the law of Massachusetts which is the subject of consideration in this case-differs in some respects from that of New York, on which the court have just passed in the case of Smith v. Turner, I propose briefly to notice it. In so doing, it is not *456 my purpose to repeat the arguments urged an vindication of the judgment of the court in that case, and which equally apply to this, but rather to state distinctly what ’I consider the point really presented by this case, and to examine some- of the propositions assumed; and arguments urged with so much ability by the learned counsel of the defendants.
The plaintiff in this case is an inhabitant of St. John’s, in the Province of New Brunswick and kingdom of Great Britain', He arrived at the port of Boston in June, 1837, in command of a schooner belonging to the port of St. John’s, having oh board nineteen alien passengers. Prior to landing, he was compelled 'to pay to the city of Boston the sum of two dollars each for permission to land said passengers. This sum of thirty-eight dollars was paid under protest, and this suit instituted to recover it back.
, The demand was made, and the money received from the plaintiff, in pursuance of the following act of the legislature of Massachusetts, passed on the 20th of April; 1837, and entitled, “ An act relating to alien passengers.”
“ § 1. When any vessel shall arrive at any port or harbour within this State, from any port or place without the same, with alien passéngers on board, the officer or officers whom the mayor and aldermen of the city, or the selectmen of the town, where it is proposed to land, such passengérs, are hereby authorized and required tó appoint, shall go on board such vessels and examine into the condition of such passengers
“ § 2. If, on such examination, there shall be found among said passengers any lunatic, idiot, maimed, aged, or infirm person, incompetent, in the opinion of the officer so examining, to maintain themselves, or who have been paupers in any other country, no such alien passenger shall be permitted to land until the master, owner, consignee, ór agent of such vessel shall have given to such city or town a bond in the sum of one thousand dollars, with good and sufficient surety, that no such lunatic or indigent passenger shall become a city, town, or State charge within ten-years from the date of said bond.
“ § 3. No alien passengers, other than those spoken of in the preceding section, shall be permitted to' land until the master, owner, consignee, or agent of such vessel shall pay to the regularly appointed boarding officer the sum of two dollars for each passenger so landing; and the money so collected shall be paid into the treasury of the city or town, to be appropriated as the city or town may direct, for the support of foreign paupers.
“ <§> 4. The officer or officers required in the first section of this act to be appointed by the mayor and aldermen, or the select *457 men, respectively, shall, from- time to time, notify the pilots of the port of said city or town of the place or places where the said examination is tó be made, and the said pilots shall be required to anchor all such vessels at the place so appointed, and require said vessels there to remain till such examination shall be made; and any pilot who shall refuse or neglect to perform the duty imposed upon Jiim by this section, or. who shall, through negligence or design, permit any alien passenger to land before such examination shall be had, shall forfeit to the city or town :a sum not less than fifty nor more than two thousand dollars.
u <§> 5. The provisions of this act shall not apply to any vessel coming on shore in. distress, or to any alien passengers taken from any wreck where life is in danger.”
It must be borne in mind (what has been sometimes forgotten); that the controversy in this case is not with regard to the right claimed by the State of Massachusetts, in the second section of this act, to repel from her shores lunatics, idiots, criminals, or paupers,, which any foreign country, or even one of her. sister States, might endeavour to thrust upon her; nor the right of any State, whose domestic security might be endangered by the admission of free, negroes, to exclude them from her borders. .This right of the States has its foundation in the sacred law of self-defence, which no power granted to Congress can restrain or annul. It is admitted by all, that those powers which relate to merely municipal legislation, or what may be more properly called internal police, ar.e not surrendered or restrained ; and that it is as competent and necessary for a State to provide precautionary measures against the moral pestilence of paupers, vagabonds, and convicts, as it is to guard against the physical pestilence which may arise from unsound and infectious articles imported. The case' of New York v. Miln asserts this doctrine, and no more. The law under consideration in that case did not interfere with passengers as such, either directly or indirectly, who were not paupers. It. put, forth no claim to tax all persons for leave to land and pass through the State to other States, or .a right to regulate the intercourse of foreign nations with the United States, or to control the policy of the general government with regard to immigrants.
But what is the claim set up in the third section of the act under consideration, with which alone we have now to deal ?
It is not the exaction of a fee or toll from passengers for some personal service rendered to them, nor ■ from the master of the vessel for some inspection or other service rendered', either to the vessel or its cargo. It is not a fee or tax for a *458 license to foreigners to. become denizens or citizens- of the Commonwealth of Massachusetts; for they have. sought no such privilege, and, so far as is yet known, may have been on their way to some other place.
It is not an exercise of the police power with regard to paupers, idiots, or convicts. The second section effectually guards against injury from, them. It is only after the passenger has been found, on inspection, not to be within the description whose crimes or poverty require exclusion, that the master of the vessel is taxed for leave to land him. Had this act commenced with the third section, might it not have been truly entitled, “ An act to raise revenue off vessels engaged in the transportation of passengers V? Its true character cannot be changed by. its collocation, nor can it be termed a policé regulation because it is in the same act which contains police regulations.
In its letter and its spirit it is an exaction from the master, owner, or consignee of á vessel engaged in the transportation of passengers, graduated on the freight or passage-money' earned by the vessel. It is, in fact, a duty on the vessel, not measured by her tonnage, it is true, but producing a like result, by merely changing thé ratio. It is a taxation of the master,, as representative of the vessel and her cargo.
It has been argued that this is not a tax on the master or the véssél, because in effect it is paid by the passenger having enhanced the price of his passage. Let us test the value of this argument by its application to other cases that naturally suggest themselves. If this act- had, in direct terms, compelled the master to pay a tax or duty levied or graduated on the ratio of the tonnage of his vessel, whose freight was earned by the transportation of passengers, it might have been said, with equal truth, that the duty was paid by the passenger, and not .by the vessel. And so, if it had .laid an impost on the goods of the passenger imported by the vessel, it might have been said, with equal reason, it .was only a tax on the passenger at last, as it comes out of his pocket, and, graduating it by the amount of his goods, affects only the modus or ratio by which-its amount is calculated. In this' way, the most stringent enactments may be easily evaded.
It is a just and well-settled doctrine established by this court, that.a State cannot do that indirectly which she is forbidden by the Constitution to do directly. If she cannot levy a duty or tax from the master or owner of a vessel engaged in commerce graduated on the tonnage or admeasurement of the vessel, she cannot effect the same purpose by merely changing the ratio, and graduating it on thé number of masts, or of ihariners, *459 the size and power of the steam-engine, or the number of passengers which she carries. We have to deal with things, and we cannot change them by changing their names. Can a State levy a duty on vessels engaged in commerce, and not owned by her own citizens, by changing its name from a “ duty on tonnage ” to a tax on the master, or an impost upon imports,'by calling it a charge on the owner or supercargo, and justify this evasion of a great principle by producing a dictionary or a dictum to prove that a ship-captain is not a. vessel, nor a supercargo an import ?
The Constitution of the United States, and the' powers confided by it to the general government, to be exercised for the benefit of all the States, ought not to be nullified or evaded by astute verbal criticism, without regard to the grand aim and object of the instrument, and the principles on which it is based. A constitution must necessarily be an instrument which enumerates, rather than defines, the powérs granted by it. .While we are not "advocates for a latitudinous construction, yet “we know of no rule for construing the extent of such powers other'than is given by the language of the instrument which confers them, taken in connection with the purpose for which they are conferred.”
Before proceeding to examine the more prominent and plausible arguments which have been urged in support of the power now claimed by the Stafe of Massachusetts, it may be proper to notice some assumptions of fact which have been used for the purpose of showing the necessity of such a power, from the hardships which it is supposed would' otherwise be inflicted on those States which claim "the right to exercise it.
. It. was assumed as á fact, that all the foreigners who arrived at the ports of Boston and New York, and afterwards became paupers, remained in those cities, and there became a public charge ; and that, therefore, this tax was for their own benefit, or that of their class. But is this the fact?' Of the many ten thousands who yearly arrive at those ports, how small a proportion select their residence there! Hundreds are almost daily transferred from the vessels in which they arrive to the railroad-car anc| steamboat, and proceed immediately on their journey to the Western .States. Are Boston, New York, and New Orleans, through which they are compelled to pass, the only cities of the Union which have to bear the burden of supporting such immigrants as afterwards become chargeable as paupers? It may well be questioned whether their proportion of this burden exceeds the ratio of their great wealth and population. But it appears by the second section of the act now before us, that all persons whose poverty; age, or infirmities render them *460 incompetent to maintain themselves are not permitted to land until a bond has been given, in the sum'of one thousand dollars, with sufficient security, that they will not become a city, town, or State charge within ten years. By the stringency of these bonds, the poor, the aged, and the infirm are compelled to continue their journey and migrate to other States; and yet, after having thus driven off all persons of this class, and obtained .an indemnity against loss by them if they remain, it is complained of ás a hardship, that the State should not be allowed to tax those .who, on examination, are found not to be within this description, — who are not paupers, nor likely to become such; and that this exaction should be demanded, not for a license to remain and become domiciled in the State, but for. leave to pass through it. But admitting the hardship of not permitting these States to raise revenue by taxing’the'citizens of other States, or immigrants seeking to become such, the answer still remains, that the question before the court is not one of feeling or discretion, but of power.
The arguments in support of this power in a State to tax vessels employed in the transportation of passengers assume, — 1st. That it is a tax- upon passengers or persons, and not upon vessels. 2d. That the States are sovereign, and -that “ the sovereign may forbid the entry of his territory either to foreigners in general or in particular cases, o&for certain purposes, according as he may think - it advantageous to the State ; and since the lord of the territory may, whenever he thinks proper, forbid its being entered, he has power to annex what conditions he pleases to the permission to enter ”; that the State of Massachusetts, having this power to exclude altogether, may therefore impose as a condition for a license to pass through her territory any amount of tax she may see fit; and this is but the exercise of the police power reserved to the State’s, and which cannot be controlled by the government of the Union. 3d. That it is but an exercise of the municipal power which every State has, to tax persons and things within her jurisdiction, and with which other States have no conéern.
Let us assume, for the- sake of argument, that this is not a duty on the vessel, nor an interference with commercial regulations made by Congress, but a tax on persons transported in the vessel, and .carry out the propositions based on this hypothesis to their legitimate results.
It must be admitted that it’ is not an exercise of the usual power to tax persons resident within a State, and their property ; but is a tax on passengers qua passengers. It is a condition annexed to a license to them to pass through the State, on their journey to other States’. It is founded on a claim by a *461 State of the power to exclude all persons from entering hei ports or passing through her territory.
It is true, that, if a State has such, an absolute and uncontrolled right 'to exclude, the inference that she may prescribe the conditions of entrance, in the shape of a license or a tax, must necessarily follow.. The' conclusion cannot be evaded if the premises be proved. A right to exclude is a power to tax; and the converse of the proposition is also true, that a power to tax is a power to exclude.; and it follows, as a necéssary result, from this doctrine, that those States in which are situated the great ports or gates of commerce have a right tó exclude, if they see fit, all immigrants from access to the interior States, and to prescribe the conditions on which they shall be allowed to proceed on .their journey, whether it be the payment of two or of two hundred dollars. Twelve States of this Union are without a seaport. The United States have, within and beyond the limits of these States, many millions of acres of vacant lands. It is the cherished policy of. the general government to encourage and invite Christian foreigners of our own race to seek an asylum within our borders, and to convert these waste lands into productive farms, and thus add to the wealth,, population, and power of the nation. Is it possible that the framers of our Constitution have'committed such an oversight, as to leave it to the discretion of some two or three States to thwart the policy of the Union, and dictate the terms upon which foreigners shall be permitted to gain access to the other States ? Moreover, if persons migrating to the Western States' may be compelled to contribute to the revenue of Massachusetts, or New York, or Louisiana, whether for the support of paupers or penitentiaries, they may with equal -justice be subjected to the same exactions in every other city or State through which they are compelled tó pass; and thus the unfortunate immigrant, before he arrives at his destined home, be made a pauper by oppressive, duties on his transit. Besides, if a State may exercise this right of taxation or exclusion on a foreigner, on the pretext that he may become a pauper, the same doctrine wül apply to citizens of other States of this Union; and thus the citizens of the interior States, who have no ports on the ocean, may be made tributary, to those who hold the gates of exit and entrance to commerce. If the bays and harbours in the United States are so exclusively the property of the States within whose boundaries they lie, that, the moment a ship comes within them, she and all her passengers become the subjects of unlimited taxation before they can- be permitted to touch the shore, the assertion, that this is ¿ question with which the citizens of other States have no *462 concern, may well be doubted. If these States- still retain ' all the rights of sovereignty, as this argument, assumes, one of the chief objects for which this Union was formed has totally failed, and “ we may again witness the scene of conflicting commercial regulations and exactions which were once so destructive to the harmony of the State's, and fatal to their commercial interests abroad.”
To guard against the recurrence of these evils, the Constitution has conferred on Congress the power to regulate commerce with foreign nations, and among the States. . That, as regards our intercourse with other nations and with one another, we might be one people, — not a mere confederacy of sovereign States for the purposes of defence or aggression.
Commerce, as defined by this court, means something more than traffic, — it is intercourse; and the power committed to Congress to regulate commerce is exercised by prescribing rules for carrying on that intercourse.' “ But in regulating commerce with foreign nations, the power of Congress does not stop at the jurisdictional lines of the several States. It would be a very useless .power if it could not pass those lines. ■ The commerce of the United States with foreign nations is that of the whole United States. Every district has a right to participate in it. The deep streams which penetrate our country in every direction pass through the interior of almost every State in the Union, and furnish the means for exercising this right. If Congress has the power to regulate it, that power must be exercised wherever the subject exists. If it exists • within the States, if a foreign voyage may commence or terminate at a port within a State, then the power of Congress may be exercised within a State.” (Gibbons v. Ogden, 9 Wheat. 195.)
The. question, whether this power is exclusive, is one on which the-majority of this court have intimated different opinions, at different times; but it is one of little practical importance in the present case, for this power has not lain dormant, like those for enacting a uniform bankrupt law, and for organizing the militia. The United Statés have made treaties, and have regulated our .intercourse with foreign nations by prescribing fits conditions. No single State has, therefore, a right to change them. To what purpose commit to Congress the power of regulating our intercourse with foreign nations and among the States, if these regulations may be changed at the discretion of each State? And to what weight is that argument entitled which assumes, that, because it is the policy of Congress to leave* this intercourse free, therefore it has not been regulated, and each State may put as many restrictions upon it as she pleases.?.
*463 The argument of those who challenge the right to exercise this power for the States of Massachusetts and New York, on the ground that it is a necessary appurtenant to- the police power, seems fallacious, also, in this respect. It assumes, that, because .a State, in the exercise of her acknowledged right, may exclude paupers, lunatics, &c., therefore she may exclude all persons, whether they come within this category or not. But she may exclude putrid and pestilential goods from being landed on her shores; yet it does not follow that she may prescribe what sound, goods may be landed, or prohibit their im-. portation' altogether. The powers used for self-defence arid protection against harm cannot be perverted into weapons of offence and aggression upon the rights of others. A State is left free to impose srich taxes as she pleases upon those who have elected to become residents or citizens; but it is not necessary to her safety or welfare that she should exact a transit duty on persons or property for permission to pass to other States.
It has been argued, also', that, as. the jurisdiction of-the State extends over the bays and harbours within her boundaries for the' purpose of punishing crimes committed thereon, therefore her jurisdiction is absolute for every purpose to’the sairie extent; and that, as she may tax persons resident on land and their ships engaged in commerce, she has an equal right to tax the- persons or property of foreigners or citizens of other States, the moment th.eir vessels arrive within her jurisdictional limits. But this argument is obnoxious to the imputation of proving too much, and therefore not to be relied on as proving any thing. For if a State has ari absolute right to tax vessels and persons coming from foreign ports, or those of other States, before they reach the .shore' and .as a condition for license to land in her ports, she may tax to any amount, and neither Congress nor this court can restrain her in the exercise of that' right; it follows, also, as a. necessary Consequence, that she may exclude all vessels but her own from entering her .ports, and may grant monopolies of the navigation of her bays and rivers. This the State of New York at one time attempted, but was .restrained by the decision of this court in the case of Gibbons v. Ogden.
In conclusion, wc are of opinion, —
1st. That the object of- the constitutional prohibition to the States to lay duties' on tonnage and imposts -.on imports was to protect both vessel and. cargó frorn State, taxation while in transitu; and this prohibition cannot be evaded, and, the same result effected, by calling it a tax on the master or passengers.
2d. That the power exercised in these cases to prohibit the *464 immigration of foreigners to other States, except on prescribed conditions, and to tax the commerce or intercourse between the citizens of these States, is not a police power, nor necessary for the preservation of the health, the morals, or the domestic peace of the States who claim to exercise it.
3d. That the power to tax this intercourse necessarily challenges the right to exclude it altogether, and thus to thwart the policy of the other States arid the Union.
4th. That Congress has regulated commerce and intercourse with foreign nations and between the several States, by willing that it shall be free, and it is therefore not left to the discretion of each State in the Union either to refuse a right of passage to persons or property through her territory, or to exact a duty for permission to exercise it.